**J. Matthew Donohue, OSB No. 065742**
MattDonohue@MarkowitzHerbold.com
**Shannon Armstrong, OSB No. 060113**
ShannonArmstrong@MarkowitzHerbold.com
**Lauren F. Blaesing, OSB No. 113305**
LaurenBlaesing@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Telephone: (503) 295-3085
Fax:  (503) 323-9105

       Attorneys for Plaintiff
       Ross Island Sand & Gravel Co.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **ROSS ISLAND SAND & GRAVEL CO.,** an Oregon corporation, <br><br> Plaintiff, <br><br> v. <br><br> **LEHIGH SOUTHWEST CEMENT COMPANY**, a California corporation, <br><br> Defendant. | Case No. 3:15-cv-01369-PK <br><br> **SECOND AMENDED COMPLAINT** <br><br> **(Claims for Breach of Contract; Breach of Express Warranty; Breach of Implied Warranty; and Declaratory Relief)** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Ross Island Sand & Gravel Company ("Ross Island") alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.

Ross Island is an Oregon company with its principal place of business in Portland, in

Multnomah County, Oregon.

//

**Page 1 -   SECOND AMENDED COMPLAINT**

2.

Defendant Lehigh Southwest Cement Company ("Defendant") is a Texas company with its principal place of business in Irving, Texas. Defendant solicited business from and did business with Ross Island in Multnomah County, maintained distribution terminals in Oregon, shipped product to Ross Island in Multnomah County, and received payment from Ross Island over many years.

3.

Ross Island and Defendant are merchants as that term is defined by ORS 72.1040(1). The transactions described herein are transactions between merchants as that term is defined by ORS 72.1040(3).

4.

This Court has original jurisdiction over Ross Island's claims under 28 U.S.C. § 1332 based on the diversity of citizenship between Ross Island and Defendant. The amount in controversy exceeds $75,000, exclusive of costs and interest. Ross Island suffered an injury in Multnomah County, Oregon caused by Defendant, as described below.

5.

Venue is proper in the United States District Court for the District of Oregon Portland Division pursuant to 28 U.S.C. § 1291 and LR 3-2 because a substantial part of the events or omissions alleged in the complaint occurred in Multnomah County, Oregon.

**BACKGROUND FACTS**

6.

Ross Island is in the business of supplying construction materials and supplies, including concrete. Among other products and services, Ross Island provides and installs concrete blocks, reinforcements, and aggregates for use in construction projects.

7.

Defendant is in the business of manufacturing and supplying cement, a key ingredient of concrete. Defendant has a cement plant in Redding, California, among other locations.

8.

Because Ross Island's products and services are often only one component of large, complex construction projects, timeliness and reliability are essential to Ross Island's reputation and relationships with its current and potential customers. Many of Ross Island's relationships with its customers span decades.

9.

Ross Island has purchased cement from Defendant for more than 40 years. To fulfill its contractual commitments to customers, Ross Island has depended on Defendant to supply cement of the precise type ordered by Ross Island, suitable for Ross Island's customers in the construction industry.

10.

Historically, Ross Island purchased cement from Defendant's cement plant in British Columbia ("BC Plant"). The BC Plant produced a type of cement suitable and necessary for Ross Island's construction projects.

11.

In approximately 2006, Defendant asked Ross Island to purchase cement from Defendant's Redding, California plant ("Redding Plant"). Ross Island agreed to purchase cement from Defendant's Redding Plant on the condition that the cement manufactured at the Redding Plant would be substantially similar to the cement Ross Island had received from Defendant's BC Plant, including that the cement from the Redding Plant would match the color, consistency, and type of cement that Ross Island had been purchasing from the BC Plant. Ross Island told Defendant that these characteristics were necessary for Ross Island's provision of concrete for local construction projects.

12.

Defendant agreed to provide cement from its Redding Plant that was substantially similar to the cement Ross Island historically purchased from the BC Plant. Over the course of several meetings, representatives of Ross Island and Defendant worked together to ensure that the cement manufactured at the Redding Plant matched the characteristics of the cement that Ross

Island purchased from the BC Plant.  Defendant's representatives visited several of Ross Island's customers to assure them that Defendant's cement from the Redding Plant was similar to the cement from the BC Plant.  Defendant understood that Ross Island needed cement that matched the cement produced at the BC Plant and promised Ross Island that the cement from the Redding Plant would match the cement from the BC Plant.

13.

After receiving Defendant's express warranty that the cement from the Redding Plant would meet Ross Island's purposes, Ross Island began purchasing cement from Defendant's Redding Plant for use in its concrete on or about July 10, 2010.  For the entire time Ross Island purchased cement from Defendant's Redding Plant, Ross Island relied on Defendant's assurances that the cement Ross Island purchased from the Redding Plant would be of the type and quality that Ross Island had previously purchased from the BC Plant – i.e. suitable cement.

**Protected Price Agreement**

14.

In 2011, representatives of Ross Island and Defendant entered into a special pricing relationship for 2012 through 2016 ("Protected Price Agreement" or "Agreement").  Under the terms of the Protected Price Agreement, Defendant agreed to provide cement to Ross Island for certain specified jobs at a lower price than the regular cement price offered by Defendant to Ross Island.  The parties agreed that the special pricing would apply to the cement Ross Island purchased for significant construction projects and its work for large general contractors, including Perlo Construction, among others ("Protected Projects" or "Special Projects").

15.

As part of the Protected Price Agreement, the parties agreed to an exclusive relationship for the provision of cement for Ross Island's Special Projects.  Through 2016, Defendant agreed to provide all of the cement that Ross Island needed to for its Special Projects, and Ross Island agreed to purchase all of the cement it needed for Special Projects from Defendant.

//

**Page 4 -   SECOND AMENDED COMPLAINT**

16.

Under the terms of the Protected Price Agreement, the parties agreed to the following prices for cement purchased for Special Projects:

    2011: $87.00/ton

    2012: $87.00/ton

    2013: $89.00/ton

    2014: $91.00/ton

    2015: $93.00/ton

    2016: $95.00/ton

17.

In 2012, Defendant provided cement to Ross Island for its Protected Projects at $87.00/ton, although cement for Ross Island's regular projects cost $91.50/ton in 2012.

18.

In 2013, Defendant provided cement to Ross Island for its Protected Projects at $89.00/ton.

19.

In 2014, Defendant provided cement to Ross Island for some, but not all, of its Protected Projects at $91.00/ton.

20.

Based on Defendant's express warranties and affirmations, Ross Island understood the cement Defendant provided would be of the same quality and meet the characteristics alleged in Paragraph 10 above.  Ross Island relied upon that understanding in entering into the Protected Price Agreement.

**Defendant's Failure to Provide Suitable Cement to Ross Island**

21.

In October 2014, after periods of not being able to provide any cement to Ross Island, Defendant told Ross Island that it would be able to start providing cement again.  However, as explained below, the cement Defendant provided Ross Island from approximately October 2014

through November 2014 did not perform as promised.  Ross Island reasonably inspected the cement it received from Defendant during this time.  However, at the time it received the cement from Defendant, Ross Island could not have known the cement was defective.  It was not until November 2014 that Ross Island determined that cement Defendant supplied during this period was defective.

22.

Ross Island notified Defendant of the problems with its cement on or about November 21, 2014, and subsequently sent photographs demonstrating the problems caused by Defendant's cement.  Ross Island also provided Defendant access to additional photographs, concrete test cylinders, and samples of faulty concrete demonstrating the problems caused by Defendant's cement.

23.

Defendant denied that its cement caused any problems and assured Ross Island that its cement was suitable for Ross Island's purposes.  However, as explained below, Defendant's cement was not suitable for Ross Island's purposes.  Accordingly, Ross Island revoked its acceptance of Defendant's cement and suspended future cement purchases from Defendant, including purchases for its Protected Projects.

**I-5 Corporate Park Project, Building W-3**

24.

On or about October 10 and 11, 2014, Ross Island picked up multiple truckloads of cement from Defendant's silo in Portland, Oregon to make concrete for a construction project called the I-5 Corporate Park, in Wilsonville, Oregon ("I-5 Corporate Park Project").  This project was a Protected Project and qualified for the special pricing pursuant to the Protected Price Agreement.

25.

Perlo Construction – the general contractor of the I-5 Corporate Park Project – had subcontracted with Ross Island to create concrete tilt panels for a building's exterior at the I-5 Corporate Park Project.  Perlo Construction is an important client to Ross Island and its largest

Page 6 -   **SECOND AMENDED COMPLAINT**

volume private works contractor.  Ross Island has supplied concrete for Perlo Construction's projects for over 30 years.

26.

On or about October 11, 2014, using the cement that Ross Island purchased from Defendant, Ross Island delivered and poured approximately 300 cubic yards of concrete at the I-5 Corporate Park Project to create the concrete tilt panels for the project.

27.

The cement Defendant supplied Ross Island did not perform as it should have. Specifically, Defendant's cement should have resulted in concrete tilt panels that would cure, or reach its optimal strength, within 24 hours.  The tilt panels at the I-5 Corporate Park Project, however, did not cure within 24 hours.  In addition, they peeled, cracked, and became discolored.

28.

The cement Defendant provided to Ross Island caused the failure of the concrete tilt panels at the I-5 Corporate Park Project.  As a result, the project's owner, Jack Martin, rejected Ross Island's panels and refused to accept any further work from Ross Island as a subcontractor. Consequently, Ross Island was compelled to reimburse Perlo Construction in the amount of $480,798.30 for the damages associated with the faulty tilt panels.

29.

After supplying cement to Ross Island for the I-5 Corporate Park Project, Defendant told Ross Island that it would not be able to supply cement for the remainder of October 2014.  As a result, Ross Island had to purchase cement from an alternate supplier.

30.

At or around the time of the I-5 Corporate Park Project, Martin had hired Ross Island, through Perlo Construction, to provide over 3,500 cubic yards of concrete for another project owned by Martin in Tualatin, Oregon (the "Hedges Project").

//

//

**Page 7 -   SECOND AMENDED COMPLAINT**

31.

As a direct and foreseeable result of the failure of the concrete tilt panels for the I-5 Corporate Park Project, Martin refused to use Ross Island for additional projects, including the Hedges Project, resulting in Ross Island losing profits of not less than $105,000.00.

32.

Perlo Construction has performed construction for projects owned by Jack Martin for over 20 years.  If Martin continues to refuse to permit Perlo Construction to use Ross Island concrete on his projects, Ross Island will incur further losses as a direct and foreseeable result of Defendant's failure to provide suitable cement.

**Burnside Bridgehead Project**

33.

The second project in which Defendant failed to provide suitable cement to Ross Island was for pilings for a high rise building for Pacific Foundations at the Burnside Bridgehead ("Burnside Bridgehead Project").

34.

On or about November 7, 2014, Defendant told Ross Island that it would be able to supply cement again.  On or about November 10, 2014, Ross Island picked up multiple truckloads of cement from Defendant's silo in Portland, Oregon to make concrete for the pilings at the Burnside Bridgehead Project.

35.

On or about November 13, November 17, November 18, November 19 and November 20, Ross Island delivered and poured approximately 225 cubic yards of concrete at the Burnside Bridgehead Project to create the pilings for the high rise building, using the cement that Ross Island purchased from Defendant.  The cement Defendant supplied to Ross Island did not perform as it should have.  Specifically, the concrete pilings at the Burnside Bridgehead Project failed to cure as expected because of the cement Defendant supplied to Ross Island.

//

//

**Page 8 -   SECOND AMENDED COMPLAINT**

**Sunrise Corridor Project**

36.

The third project in which Defendant failed to provide suitable cement to Ross Island was for the construction of a bridge deck in Clackamas, Oregon ("Sunrise Corridor Project").

37.

On or about November 18, 2014, Ross Island picked up multiple truckloads of cement from Defendant's silo in Portland to make concrete for the bridge deck at the Sunrise Corridor Project.

38.

On or about November 18, 2014, using the cement that Ross Island purchased from Defendant, Ross Island delivered and poured approximately 414.5 cubic yards of concrete at the Sunrise Corridor Project for the concrete bridge deck.  The cement Defendant supplied to Ross Island did not perform as it should have.  Specifically, the concrete bridge deck failed to cure as expected because of the cement that Defendant supplied to Ross Island.

**Athey Creek Project**

39.

The fourth, and final, project in which Defendant provided cement that did not perform properly was for a construction project called Athey Creek Christian Fellowship ("Athey Creek Project"), in West Linn, Oregon.  Perlo Construction contracted with Ross Island to provide concrete for concrete slab for basement flooring.

40.

On or about the evening of November 19, 2014, Ross Island picked up multiple truckloads of cement from Defendant's silo in Portland to be used for the basement floor slab at the Athey Creek Project.  Ross Island poured approximately 154 cubic yards of concrete for the basement floor on or about November 20, 2014.

41.

The cement Defendant supplied to Ross Island did not perform as it should have. Specifically, the concrete slab did not timely set, which lead to an unusable surface on the

concrete slab and a delay in the project.  As a result of the failure of Defendant's cement, Ross Island had to reimburse Perlo Construction in the amount of $123,073.89 for costs associated with the faulty concrete floor, which had to be torn out and re-poured.

42.

On or about November 21, 2014, Ross Island representative Ken Gambill informed Defendant's sales manager, Tony McCauley, about the problems with the cement and resultant defective concrete slab at the Athey Creek Project.  Ross Island subsequently sent Defendant photographs reflecting the defects in the Athey Creek Project slab.

43.

In the wake of this fourth failed project with Defendant's cement, Ross Island concluded that Defendant had not supplied Ross Island the cement it bargained for.  Cement from another supplier used by Ross Island the same day it poured the concrete slab at the Athey Creek Project did not result in any delays in setting or any other problems.

44.

Ross Island ceased all further cement orders from Defendant after informing Defendant of the problems with its cement on or about November 21, 2014.

45.

Ross Island paid Defendant in full for the cement used for the I-5 Corporate Park Project, Athey Creek Project, Burnside Bridgehead Project, and Sunrise Corridor Project.  Defendant, however, provided cement that was not suitable for Ross Island's intended use and was not of the type that Defendant had expressly warranted it would provide to Ross Island.  Defendants' failure to supply suitable cement has resulted in substantial economic harm to Ross Island, including lost profits and reputational harm.

**Loss of Protected Price for Cement in 2015 and 2016**

46.

Because of Defendant's failure to provide suitable cement, Ross Island is unable to purchase cement at the price it was promised in the Protected Price Agreement.  To produce

**Page 10 - SECOND AMENDED COMPLAINT**

concrete for its Special Projects, Ross Island must obtain cement from another supplier at a cost more than the special pricing guaranteed by Defendant through 2016.

47.

In 2015, the market price of cement is $24.50 more per ton than the special price agreed to by the parties.  Ross Island has purchased, or will purchase, approximately 34,980 tons of cement in 2015 from other suppliers for its Special Projects.  But for Defendant's failure to supply cement that performed properly, Ross Island would have purchased this cement from Defendant at the special price.  As a direct and foreseeable result of Defendant's failure to provide suitable cement, Ross Island will have to pay at least $857,010.00 in 2015 to purchase cement from other suppliers that it otherwise would have purchased from Defendant at the special price.

48.

In 2016, Ross Island estimates that the market price of cement will be $30.50 more per ton than the special price agreed to by the parties.  Ross Island expects to purchase approximately 26,980 tons of cement in 2016 from other suppliers for its Special Projects, that but for Defendant's failures, it would have purchased from Defendant at the special price.  As a direct and foreseeable result of Defendant's failure to provide suitable cement, Ross Island will have to pay at least $822,890.00 in 2016 to purchase cement from other suppliers that it otherwise would have purchased from Defendant at the special price.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

49.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

50.

Under the terms of the Protected Price Agreement, Defendant agreed to provide cement to Ross Island for certain specified jobs at a lower price than the regular cement price offered by Defendant to Ross Island.

//

**Page 11 - SECOND AMENDED COMPLAINT**

51.

Ross Island fulfilled its obligations and all conditions precedent under the contract.

52.

Defendant breached the contract by: failing to supply cement as needed for Ross Island's Special Projects; providing Ross Island cement that did not perform as it should have; and failing to reimburse Ross Island for the difference between the pricing in the Protected Price Agreement and the amount Ross Island has paid for cement from an alternate manufacturer.

53.

Ross Island could not have discovered Defendant's breach upon reasonable inspection of the goods.

54.

As a direct and foreseeable result of Defendant's breaches of contract, Ross Island has suffered economic injury.  Ross Island is entitled to damages pursuant to ORS 72.7110 - ORS 72.7150 in an amount not less than $2,388,772.19 plus prejudgment interest, in addition to an amount to be determined at trial, to compensate Ross Island for its loss in business and business reputation, and such other and further relief as the Court may deem just and proper.

## SECOND CLAIM FOR RELIEF
### (Breach of Express Warranty – ORS 72.3130)

55.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

56.

Defendant expressly warranted that the cement it provided to Ross Island was the type of cement suitable and necessary for Ross Island's Special Projects.  Those affirmations were part of the basis of the bargain.

57.

Defendant breached this warranty by providing cement that did not function as Defendant warranted it would.

//

**Page 12 - SECOND AMENDED COMPLAINT**

58.

As a direct and foreseeable result of Defendant's breaches of express warranty, Ross Island suffered economic injury.  Ross Island is entitled to damages pursuant to ORS 72.7110 - ORS 72.7150 in an amount not less than $2,388,772.19 plus prejudgment interest, in addition to an amount to be determined at trial, to compensate Ross Island for its loss in business and business reputation, and such other and further relief as the Court may deem just and proper.

**THIRD CLAIM FOR RELIEF**
**(Breach of Implied Warranty of Merchantability – ORS 72.3140)**

59.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

60.

Defendant impliedly warranted that the cement it supplied to Ross Island for the projects described above was fit for its ordinary purpose.

61.

Defendant breached these warranties by providing cement that was not fit for its ordinary purpose.

62.

As a direct and foreseeable result of Defendant's breach of implied warranty, Ross Island has suffered economic injury.  Ross Island is entitled to damages pursuant to ORS 72.7110 - ORS 72.7150 in an amount not less than $2,388,772.19 plus prejudgment interest, in addition to an amount to be determined at trial, to compensate Ross Island for its loss in business and business reputation, and such other and further relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Implied Warranty of Fitness for a Particular Purpose – ORS 72.3150)**

63.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

//

//

**Page 13 - SECOND AMENDED COMPLAINT**

64.

Defendant is in the business of manufacturing and supplying cement. Accordingly, Defendant has superior knowledge and skill compared to Ross Island on how to manufacture cement that performs as warranted.

65.

When Defendant supplied cement to Ross Island, Defendant knew that Ross Island would use Defendant's cement to make concrete, that Ross Island would rely on Defendant's skill or judgment to furnish cement that was suitable for Ross Island's purposes, and that Ross Island did in fact rely on Defendant's skill or judgment to furnish cement that was suitable for Ross Island's purposes.

66.

Defendant impliedly warranted that the cement it supplied to Ross Island for the projects described above was fit for such purposes.

67.

Defendant breached these warranties by providing cement that was not fit for Ross Island's purposes.

68.

As a direct and foreseeable result of Defendant's breach of implied warranty, Ross Island has suffered economic injury. Ross Island is entitled to damages pursuant to ORS 72.7110 - ORS 72.7150 in an amount not less than $2,388,772.19 plus prejudgment interest, in addition to an amount to be determined at trial, to compensate Ross Island for its loss in business and business reputation, and such other and further relief as the Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF
### (Declaratory Relief)

69.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

//

//

**Page 14 - SECOND AMENDED COMPLAINT**

70.

Pursuant to ORS 28.010 et. seq., Ross Island is entitled to a declaration of the rights and responsibilities of the parties under its contract with Defendant for the sale of cement for the Protected Projects, including a judicial declaration that Defendant is liable for the unsuitable cement supplied to Ross Island.

71.

**SIXTH CLAIM FOR RELIEF**
**(Attorney Fees)**

72.

Ross Island re-alleges and incorporates the above paragraphs as if fully stated herein.

73.

Defendant has asserted an affirmative defense of release, alleging that Ross Island's claims should be denied in whole or in part based on the fact that Ross Island and Defendant executed a Settlement Agreement dated as of January 23, 2015. Defendant alleges that Ross Island released, in part, its right to pursue certain claims against Defendant, including some or all of the claims alleged by Ross Island in this matter.

74.

Under the Settlement Agreement, Ross Island is entitled to recover its reasonable attorney fees and other fees and costs incurred in connection with the subject matter of the Settlement Agreement if Ross Island prevails on Defendant's affirmative defense of release.

**PRAYER FOR RELIEF**

WHEREFORE, Ross Island prays for judgment against Defendant as follows:

    A. Damages in an amount to be determined at trial, but in any event, not less than $2,388,772.19;

    B. A judicial declaration of the rights and responsibilities of the parties under the contract between the parties for the sale of cement for the Protected Projects, including a judicial declaration that Defendant is liable for the unsuitable cement it supplied to Ross Island;

**Page 15 - SECOND AMENDED COMPLAINT**

C.  Attorney fees pursuant to the Settlement Agreement;

D.  Prejudgment interest and post-judgment interest as allowed by law; and

E.  Such other relief as the Court deems just and proper.

DATED this 10th day of November, 2015.

MARKOWITZ HERBOLD PC

By:    */s/ Lauren F. Blaesing*
          J. Matthew Donohue, OSB #065742
          MattDonohue@MarkowitzHerbold.com
          Shannon Armstrong, OSB #060113
          ShannonArmstrong@MarkowitzHerbold.com
          Lauren F. Blaesing, OSB #113305
          LaurenBlaesing@MarkowitzHerbold.com
          (503) 295-3085
          Of Attorneys for Plaintiff

483491