THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

ROSS ISLAND SAND & GRAVEL CO.,

      Plaintiff,

    v.

LEHIGH SOUTHWEST CEMENT CO.,

      Defendant.

No. 3:15-cv-01369-PK

**OPINION AND ORDER**

**PAPAK, Magistrate Judge:**

Plaintiff Ross Island Sand & Gravel Co. (Ross Island) manufactures and sells concrete. For forty years, Ross Island purchased cement, a key ingredient in concrete, from defendant Lehigh Southwest Cement Co. (Lehigh).

In this action, Ross Island alleges that in fall 2014, Lehigh sold defective cement that caused Ross Island's concrete to fail at two construction sites. Ross Island claims that Lehigh is liable for damages caused by the allegedly defective cement.

After the alleged failure of Lehigh's cement, Ross Island began purchasing all of its cement from a different cement supplier that charged higher prices than Lehigh. Ross Island now claims that Lehigh is obligated to pay Ross Island for the price difference, based on the parties' 2012 "price protection agreement," in which Lehigh agreed to charge Ross Island discounted prices for cement used in three specific construction projects. I refer to these claims as cost-to-

cover or price protection claims. Ross Island brings claims for breach of contract, breach of express warranty, breach of implied warranty, breach of the covenant of good faith and fair dealing, promissory estoppel, declaratory relief, and attorney's fees.

Lehigh now moves for summary judgment on all of Ross Island's claims. Lehigh also moves to exclude opinion evidence from Ross Island's expert William Weyrauch; to strike the proposed testimony of certain Ross Island witnesses; and to amend its answer to include an affirmative defense.

Ross Island moves for partial summary judgment on Lehigh's affirmative defense based on the parties' January 2015 settlement agreement (the 2015 Settlement Agreement).

For the reasons that follow, I grant Lehigh's motion for summary judgment as to Ross Island's price protection claims, and deny the motion as to the defective cement claims. I deny Lehigh's motion to exclude Weyrauch's expert opinion, and its motion to strike proposed testimony. I grant Lehigh's motion to amend its answer. I deny Ross Island's motion for partial summary judgment.

## I. LEHIGH IS ENTITLED TO SUMMARY JUDGMENT ON ROSS ISLAND'S COST-TO-COVER CLAIMS

In its cost-to-cover claims, Ross Island seeks to recover the difference between Lehigh's proposed cement prices for 2015 and 2016 under the parties' 2012 price protection agreement (the Price Protection Agreement), and the higher prices Ross Island now pays for cement from its current supplier, Ash Grove Cement Co. I conclude that Ross Island has failed to overcome the Statute of Frauds' requirement of a writing to show that the parties agreed to expand the 2012 Price Protection Agreement beyond the three construction projects specified in the original agreement.

Page 2   -   OPINION AND ORDER

## A. Background

### 1. The 2012 Price Protection Agreement

Before entering into the 2012 Price Protection Agreement at issue, the parties reached similar agreements in 2006 and in 2010. Armstrong Decl. Exs. 36Under each agreement, Lehigh granted Ross Island discounted prices per ton of cement that Ross Island purchased for specified large construction projects. For example, in the parties' 2010 price protection agreement, Lehigh agreed to charge Ross Island $87 per ton of cement in 2011, discounted from Lehigh's base price of $94 per ton. Armstrong Decl. Ex. 37, ECF No. 73-36. The 2010 agreement listed the construction projects to which it applied, and included a discount schedule for subsequent years through 2014. Both the 2006 and the 2010 price protection agreements were oral agreements, which were documented at a later time. Armstrong Decl. Ex. 13, at 136-38.[1]

The parties orally agreed to the Price Protection Agreement at issue here on April 17, 2012, when Bill Boughton, Lehigh's vice president of sales, met with Chuck Steinwandel, Ross Island's president and CEO, in a Portland restaurant. The next day, Steinwandel handwrote the terms of the Price Protection Agreement on a spreadsheet that listed the three construction projects that would be eligible for the discounted cement prices, with estimates for the amount of cement required per year. The three construction projects were the Willamette River Transit Bridge, Portland Milwaukie Light Rail, and the Sellwood Bridge.

Steinwandel's summary of the 2012 Price Protection Agreement stated:

Presented and agreed between myself and Bill Boughton on the evening of April 17, 2012. Regular pricing on cement for 2012, starting April 1, 2012, is 91.50

---

[1]Page numbers for deposition transcripts refer to the page numbers for the original transcript, not the page numbers for the exhibit that contains selected pages of the transcript.

> [per] ton.  Standard pricing, 96.50 ton.  [Ross Island] will pay down debt[2] by
> $300,000 by Dec. 31, 2012.  [Initialed by Steinwandel and dated April 18, 2012]

Armstrong Decl. Ex. 21.  Steinwandel testified that his handwritten summary is essentially a

"complete recitation of the [Price Protection Agreement]."  Armstrong Decl. Ex. 13, at 154.

To receive price rebates under the 2012 Price Protection Agreement, Ross Island sent

Lehigh monthly spreadsheets showing the amount of cement Ross Island had purchased from

Lehigh during the previous month for the three specified construction projects.  *See* Armstrong

Decl. Ex. 11, at 148-49.  Because of Ross Island's outstanding debts, Lehigh applied the rebate

credits to Ross Island's old debt.  Armstrong Decl. Ex. 2, at 114 (Boughton Depo.).

The key issue for the cost-to-cover claims is whether Lehigh agreed to modify the 2012

Price Protection Agreement to include construction projects that were not covered by the initial

Agreement.  Steinwandel testified that during the April 17, 2012 meeting, he asked Boughton to

consider adding other construction projects to the Price Protection Agreement, and Boughton

responded, "If you have other projects, come to me, and then we'll discuss whether I'm going to

protect those projects."  Armstrong Decl. Ex. 13, at 161.  Steinwandel testified that he had "a

general memory" of discussing with Boughton an expansion of the Price Protection Agreement

to include other construction projects, but he had no "specific recall of a particular conversation

on a particular date or time."  Anderson Decl. Ex. 8, at 69, ECF No. 47.  Steinwandel considered

the inclusion of additional projects to be an expansion of the 2012 Price Protection Agreement.

Armstrong Decl. Ex. 14, at 43.

During 2013, Ross Island sent Lehigh monthly spreadsheets showing the amount of

---

[2] As of April 2013, Ross Island owed Lehigh about $1.7 million.  Anderson Decl., Ex. 10, at 1.

cement purchased from Lehigh during the previous month for the three specified projects. Through 2013, Ross Island apparently limited its monthly spreadsheets to cement used in the three construction projects specified by the Agreement.

Ross Island asserts that sometime in late 2013, Steinwandel and Boughton agreed to expand the Price Protection Agreement. Pl. Opp'n 8, ECF No. 71. Steinwandel testified that Lehigh, through Boughton, agreed to discount cement used in construction projects by four contractors: Skanska USA Building Inc., Perlo Construction, Cascade Bridge LLC, and Pacific Foundation. *See* Armstrong Decl. Ex. 14, at 40-41, ECF No. 73-13. But Ross Island has not presented any writing showing an agreement to modify the Price Protection Agreement. Boughton testified that he never agreed to expand the 2012 Price Protection Agreement beyond the original three projects. He testified that "the only thing that was protected, in my eyes and my understanding, were those three jobs." Anderson Decl. Ex. 5, at 122.

In an attempt to show that the parties did agree to expand the Agreement, Ross Island cites the monthly spreadsheets it sent Lehigh to receive discounted cement prices. In early 2014, Ross Island changed the format of the monthly spreadsheets to show the tons of cement used by the four contractors, without showing on which construction projects the cement was used. A Ross Island employee, Ken Gambill, testified he decided to change the format of the spreadsheets, noting that by the end of 2013, "We were running out of projects. We had done the first group [named in the initial agreement]." Anderson Decl. Ex. 6, at 261. Relying on the newly formatted spreadsheets, in 2014, Lehigh granted discounts to Ross Island for cement used by the four contractors, regardless of whether the cement was used on the three construction projects specified in the original Price Protection Agreement.

Lehigh now argues that its employees assumed that Ross Island would seek discounts only for the three original projects named in the 2012 Price Protection Agreement. Boughton testified that "everything that was submitted [by Ross Island as eligible for the discount], I would have assumed was appropriate and right for those three jobs. So, if . . . a couple of jobs that got on that list that got by, it could have been overlooked by [a Lehigh employee]; unfortunate, but that could have been the case." Anderson Decl., Ex. 5, at 122. Referring to Ross Island's 2014 spreadsheets, Boughton stated, "If they weren't related to those three jobs, they should not be requested for special pricing." Anderson Decl. Ex. 5, at 121.

In May 2014, Lehigh employee Tony McCauley asked Ross Island employee Ken Gambill about the new format for the cement usage spreadsheets. Referring to the April 2014 spreadsheet as an example, McCauley asked Gambill why Ross Island listed cement use by contractor rather than by project, as it had in the 2013 spreadsheets. Although McCauley did not receive a complete answer from Gambill, he did not pursue the issue further. Armstrong Decl. Ex. 11, at 151, 152.

After the concrete at a construction project failed, Ross Island stopped purchasing cement from Lehigh on November 21, 2014. Ross Island began purchasing cement from Ash Grove at higher prices than Lehigh's prices would have been under the Price Protection Agreement.

In June 2015, Ross Island filed this action against Lehigh in Multnomah County Circuit Court. In July 2015, Lehigh removed the action to this court.

### 2. The Parties' 2015 Settlement Agreement

In 2012 and 2013, Ross Island fell behind on its payments due to Lehigh. In April 2013, Ross Island agreed to repay Lehigh about $1.7 million, in quarterly payments of $50,000 until

fully paid. Anderson Decl., Ex. 10, at 1. In July 2013, Ross Island again fell behind on its

payments to Lehigh, accruing a new balance of about $731,000, in addition to the amount already

owing. Ross Island agreed to make payments of $7,000 three times per month.

In January 2015, Lehigh filed a complaint in Multnomah County Circuit Court against

Ross Island and other defendants, seeking amounts due under its agreements with Ross Island.

About ten days later, Ross Island and Lehigh reached a settlement agreement (the 2015

Settlement Agreement). Ross Island agreed that it owed Lehigh $1.3 million, including

attorney's fees and costs up to January 22, 2015. Ross Island paid Lehigh $100,000 and agreed

to pay Lehigh $750,000 by February 27, 2015, and the remainder due, about $450,000, by

January 22, 2016.

The 2015 Settlement Agreement included the following release:

> 5. RELEASES
> Subject to the complete and timely performance of all obligations set forth
> in this Agreement, the Parties, on behalf of themselves and their subsidiaries,
> parent companies, affiliates, owners, members, shareholders, officers,
> attorneys, directors, employees, contractors, and representatives hereby release
> and discharge each other from all claims, counterclaims, cross-claims, causes of
> action, liens, damages, charges, penalties, and obligations whether known or
> unknown, or which the Parties have ever had or now have, arising at any time up
> to the Effective Date of this Agreement (the "Released Claims"). Except as
> expressly set forth herein, the Parties shall each pay their own attorney fees
> incurred in connection with the Litigation and this Agreement.
> *Explicitly excluded from the Released Claims are any and all*: (I) claims
> arising from or in any way related to the enforcement of this Agreement; (ii)
> *claims made by Ross Island against Lehigh arising out of the quality of the
> Product*[3]; and (iii) claims that are not otherwise released in this Agreement.
> Notwithstanding anything to the contrary herein, Lehigh's obligations, if any,
> under any warranty or warranty exclusion or limitation applicable to any of the
> Product shall remain unchanged.

---

[3]The word "Product" refers to Lehigh's cement.

Anderson Decl., Ex. 10, at 5 (emphasis added).

### B. Legal Standards for Summary Judgment Motions

The court must grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law governing a claim or defense determines which facts are material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998). In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh evidence. *See Anderson*, 477 U.S. at 255.

### C. Ross Island's Claims Under the 2012 Price Protection Agreement

#### 1. Ross Island Has Not Shown That the Parties Agreed to Expand the 2012 Price Protection Agreement

A valid contract "requires a clear and unequivocal acceptance of a certain and definite offer." *Estey & Assocs., Inc. v. McCulloch Corp.*, 663 F. Supp. 167, 173 (D. Or. 1986). A discussion will not create a contract "unless it is carried on to such an extent that the minds of the parties meet upon all the essential terms." *Steel Prod. Co. of Oregon, Inc. v. FMD Corp.*, 282 Or. 513, 519, 579 P.2d 855, 858 (1978) (citations and quotation marks omitted). The party asserting the existence of an agreement bears the burden of proof. *See J. L. Price Brokerage Co. v. Baker Grocery Co.*, 94 Or. 538, 548, 186 P. 23, 25 (1919).

Page 8  -  OPINION AND ORDER

Here, Lehigh contends that Ross Island's cost-to-cover claims fail because the alleged

expansion of the Price Protection Agreement is not documented by a writing.  Under the Statute

of Frauds, "a contract for the sale of goods for the price of $500 or more is not enforceable by

way of action or defense unless there is some writing sufficient to indicate that a contract for sale

has been made between the parties and signed by the party against whom enforcement is sought

or by the authorized agent or broker of the party."  Or. Rev. Stat. § 72.2010(1).  The Statute of

Frauds' writing requirement also applies to alleged oral modifications of an agreement.  Or. Rev.

Stat. § 72.2010(3) ("The requirements of ORS 72.2010, relating to the statute of frauds must be

satisfied if the contract as modified is within its provisions.").  The Uniform Commercial Code

(UCC)'s official commentary on the UCC's equivalent to Or. Rev. Stat. § 72.2010(3) is

instructive here:

> The Statute of Frauds provisions of this Article are expressly applied to
> modifications by subsection (3).  Under those provisions the "delivery and
> acceptance" test is limited to the goods which have been accepted, that is, to the
> past.  "Modification" for the future cannot therefore be conjured up by oral
> testimony if the price involved is $500.00 or more since such modification must
> be shown at least by an authenticated memo.  And since a memo is limited in its
> effect to the quantity of goods set forth in it there is safeguard against oral
> evidence.

Official Comment 3, UCC 2-209 (noting that subsection (3) is "intended to protect against false

allegations of oral modifications").

Ross Island has not provided any writing showing that the parties agreed to modify the

2012 Price Protection Agreement to include additional construction projects.  Steinwandel

testified that Boughton told him, in effect, "If you have other projects, come to me, and then

we'll discuss whether I'm going to protect those projects."  Armstrong Decl. Ex. 13, at 161.

Steinwandel's deposition testimony on this issue is at best vague and provisional, while

Page 9  -  OPINION AND ORDER

Boughton denies that Lehigh agreed to modify the Agreement to include additional construction projects.

Ross Island argues that it has presented documents showing the parties agreed to modify the Price Protection Agreement to include additional projects. "If a writing is used to supply rather than to explain a term in another writing, then there must be additional evidence that the parties intended the two writings to be read together." *McInnis v. Lind*, 108 P.3d 578, 585, 198 Or. App. 139, 149 (2005). Here, none of the evidence cited by Ross Island shows that the parties agreed to modify the Price Protection Agreement.

As evidence of the alleged modification, Ross Island cites a July 2012 email it sent to Lehigh, attached to a spreadsheet report on cement usages, which states, "This report will change as we add other work to the locations that are part of the agreement between Ross Island and Lehigh." Armstrong Decl. Ex. 46. The email acknowledges that additional work will occur on the three large construction projects subject to the Price Protection Agreement, but the email does not show that the parties agreed to include additional construction projects.

Ross Island also cites the testimony of Tony McCauley, a Lehigh employee, that the Price Protection Agreement included locations where work had not yet begun. I note that McCauley had no role in negotiating the 2012 Price Protection Agreement. *See* Armstrong Decl. Ex. 14, at 25 (Steinwandel testified that he negotiated "singly and solely" with Boughton). In any event, McCauley's statement is consistent with the terms of the 2012 Price Protection Agreement, which contemplated that the three large construction projects would be pouring concrete at multiple locations.

In a further attempt to show a writing that documents the alleged expansion of the Price

Protection Agreement, Ross Island cites the monthly spreadsheets it sent to Lehigh during 2014, which sought price rebates for cement used on projects that were not included in the original Price Protection Agreement. Ross Island contends that Lehigh's willingness to allow credit for additional construction projects shows that the parties had a course of dealing that modified the original terms of the 2012 Price Protection Agreement. I disagree. The monthly spreadsheets refer only to past usage, so they are limited in effect "to the quantity of goods set forth" in them. In other words, the monthly spreadsheets, which covered cement used during the prior month, cannot show an agreement to continue granting discounts for other projects in the future. Lehigh's willingness, mistaken or not, to grant discounts based on Ross Island's 2014 spreadsheets does not show an intent to extend the discounts to future purchases of cement.

Ross Island also argues that the 2012 Price Protection Agreement was a requirements contract, and that the Statute of Frauds does not require that requirements contracts include a written provision on the quantity of goods to be sold. Instead, a requirements contract may satisfy the Statute of Frauds if the parties agree that the quantity of goods sold will be the amount required by the buyer. *See* Or. Rev. Stat. § 72.3060(1).

Here, while I agree with Ross Island that the 2012 Price Protection Agreement is a requirement contract, I conclude that it is a requirements contract only as to the three projects named in the Agreement. The estimated cement usage figures included in the Price Protection Agreement are based on the three specified construction projects. To add multiple unknown construction projects as eligible for discounts would be a material modification of the Agreement that must be evidenced by a writing to be enforceable. *See In re Empire Pac. Indus., Inc.*, 71 B.R. 500, 504 n.3 (Bankr. D. Or.1987) ("The addition of a quantity term other than that

previously agreed to would materially alter the terms of the contract.").

Ross Island also relies on the UCC merchant rule, which provides:

> Between merchants, if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) of this section against such party unless written notice of objection to its contents is given with 10 days after it is received.

Or. Rev. Stat. § 72.2010(2). I agree with Lehigh that the merchant rule does not aid Ross Island here, because, as noted, the spreadsheets submitted by Ross Island in 2014 do not show an agreement to expand the Price Protection Agreement to include additional projects. Lehigh's apparently cavalier attitude in allowing price rebates beyond the three construction projects, without more, does not show an intent to expand the Price Protection Agreement.

In an attempt to avoid the requirements of the Statute of Frauds, Ross Island argues that Lehigh is liable under a promissory estoppel theory. "In Oregon promissory estoppel is not a cause of action in itself, but is a subset of and a theory of recovery in breach of contract actions." *Kraft v. Arden*, No. 07-487-PK, 2008 WL 4866182, at *10 (D. Or. Nov. 7, 2008) (citations and quotation marks omitted). "Under promissory estoppel, the party seeking enforcement of a promise must demonstrate: '1) a promise, 2) which the promisor, as a reasonable person, could foresee would induce conduct of the kind which occurred, 3) actual reliance on the promise, 4) resulting in a substantial change in position.' A party may seek relief under promissory estoppel when no valid contract exists. Thus, promissory estoppel can defeat the Statute of Frauds." *Id.* (citations omitted).

Here, Ross Island alleges that it relied on Boughton's alleged statement to Steinwandel that he would consider future requests to expand the discount agreement to other projects.

Page 12 -  OPINION AND ORDER

Steinwandel could not recall specifically when Boughton orally agreed to expand the Price Protection Agreement. Boughton's alleged statements are no more than an illusory promise, which cannot justify Ross Island's alleged reliance. *See Kraft*, at *36.

Nor has Ross Island shown evidence of detrimental reliance. Ross Island has not presented documents supporting its assertions that it submitted lower bids to contractors based on Lehigh's discounted price for cement.

Ross Island argues that the court should strike evidence submitted by Lehigh in support of its Statute of Frauds affirmative defense because Lehigh's Rule 30(b)(6) witness, Boughton, did not mention the deposition testimony of Steinwandel as evidence supporting the defense. I see no prejudice to Ross Island when its CEO's deposition testimony is used as evidence against it.

As an additional affirmative defense, Lehigh contends that Ross Island failed to mitigate damages. Lehigh notes that when Ross Island stopped purchasing cement that Lehigh manufactured in Redding, California, Ross Island did not seek to substitute cement that Lehigh manufactured in British Columbia, which Ross Island considered high quality and used for many years until 2010. Instead, Ross Island chose to pay a higher price for cement from Ash Grove. Because I conclude that Lehigh is entitled to summary judgment on the cost-to-cover claims, I need not address this defense.

### 2. The 2015 Settlement Agreement Bars Ross Island's Price Claims

Alternatively, Lehigh contends that it is entitled to summary judgment on Ross Island's price protection claims because of the 2015 Settlement Agreement, which releases all claims except, as relevant here, "claims made by Ross Island against Lehigh arising out of the quality of the Product [i.e., cement]." Lehigh argues that Ross Island's price protection claims are based on

the quantity of Lehigh's cement, not its quality.

Because I conclude that the Statute of Frauds bars the price protection claims, I need not address the effect of the 2015 Settlement Agreement.

## II. DISPUTED ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON ROSS ISLAND'S DEFECTIVE CEMENT CLAIMS

The cement sold by Lehigh to Ross Island is referred to as C150-12, Type I/II under standards set by the American Society for Testing and Materials (ASTM). Anderson Decl., Ex. 1, at 11, ECF No. 47. For about 30 years, Lehigh sold Ross Island Type I/II cement that was manufactured in Vancouver, British Columbia, which the parties refer to as Delta cement.[4] Armstrong Decl. Ex. 13, at 105 (Steinwandel Depo.).

Starting in about 2008, Lehigh asked Ross Island to switch from the Delta cement to cement Lehigh manufactured at a plant in Redding, California. Steinwandel testified that he initially refused to switch to Redding cement because Delta cement had performed so reliably for many years. After Ross Island and Lehigh separately compared Redding cement to Delta cement. Steinwandel decided that Redding cement would be satisfactory. Anderson Decl. Ex. 6, at 108 (Ken Gamill Depo). By July 2010, Ross Island switched to Redding cement and stopped using Delta cement. Armstrong Decl. Ex. 19.

Wayne Flues, Ross Island's quality control manager, testified that from 2010 until fall 2014, Ross Island had no problems with the Redding cement. Flues stated that "we trusted [the Redding cement] and used it exclusively for the Tilikum Bridge project . . . because of our trust in that cement, and in our ability to produce strengths that we needed, like we needed to happen."

---

[4] Former Ross Island president and CEO Chuck Steinwandel referred to Delta cement as "Tilbury cement." Armstrong Decl. Ex. 13, at 76-77 (Steinwandel Depo.).

Armstrong Decl. Ex. 4, at 122.

### A. Concrete Failures at Two Projects

Ross Island alleges that Lehigh's cement caused its concrete to fail at two construction projects.[5] The first concrete failure occurred on October 11, 2014, at the I-5 Corporate Park project in Wilsonville, Oregon. The concrete was used for a "tilt wall panel," placed on October 11, 2014. Anderson Decl., Ex. 1 at 47. Tilt wall panels are poured onto a casting slab and then tilted into place. The project owner rejected the panels because of surface imperfections when the panels were lifted into place. Perlo Construction, the contractor, removed and replaced the panels.

The second concrete problem was at a foundation poured at the Athey Creek project in West Linn, Oregon. On November 20, 2014, Ross Island concrete was poured for a basement floor slab. Ross Island alleges that Lehigh cement caused the concrete slab to set too slowly. Before the slab could set, it rained, ruining the slab's surface and requiring removal and a new pour.

Ross Island's expert, William Weyrauch, used the process of elimination to conclude that Lehigh's cement had the problems with Ross Island's concrete at the I-5 and Athey Creek projects. Weyrauch reasoned that he could eliminate all other possible external and internal reasons for the concrete problems, other than the cement. Although Weyrauch acknowledged that Lehigh's regular test records indicated that Lehigh's cement met the standards for Type I/II

---

[5] In its Second Amended Complaint, Ross Island alleged that Lehigh's cement caused two other concrete failures, at the Burnside Bridgehead Project and the Sunrise Corridor Project. 2d Amd. Compl. ¶¶ 33-38, ECF No. 22. In the Third Amended Complaint, which is now the operative complaint, Ross Island has dropped its allegations about these two projects.

cement, Weyrauch concluded compliance with the basic standards was not sufficient to show that the Lehigh cement had performed adequately.

I conclude that disputed issues of material fact exist whether Lehigh provided defective cement. At the Athey Creek project, Wayne Flues, Ross Island's quality control manager, observed that concrete containing Lehigh cement did not set properly, but concrete using the same mix, except with Ash Grove cement, did set properly. Flues testified that he was surprised by this result because "[i]f anything, it's the coldest part of the slab. It should be the part that's not. It shouldn't be setting up, because it doesn't have the protection and the heat of the rest of that slab. This should be the least set-up part of the whole thing." Armstrong Decl. Ex. 5, at 143.[6]

Lehigh argues that Ross Island's breach of warranty claims are barred by the warranty disclaimer included on Lehigh's invoices. The disclaimer provides that the cement "shall conform to the present standard specifications (for the respective types) of the American Society for Testing and Materials, and no other warranty, representation or condition of any kind, express or implied (including no warranty of merchantability or of fitness for a particular purpose) shall apply thereto." Anderson Decl. Ex. 5, at 24. Under the UCC, a contract for the sale of goods includes an implied warranty that the goods shall be merchantable "if the seller is a merchant with respect to goods of that kind." Or. Rev. Stat. § 72.3140. "The purpose of such a warranty is to protect the buyer of goods from bearing the burden of loss when the goods, although not violating an express warranty, do not meet the buyer's particular purpose." *Controltek, Inc. v.*

---

[6]Lehigh moves to strike this and other portions of Flues's deposition testimony. I will discuss Lehigh's motion to strike below.

*Kwikee Enterprises, Inc.*, 284 Or. 123, 128, 585 P.2d 670, 673 (1978). I conclude that there are disputed issues of material fact on whether there was at least an implied warranty of fitness for purpose that goes beyond simply meeting the standards for Type I/II cement.

### III. Lehigh's Motion to Exclude Expert Opinion Evidence

Lehigh moves to exclude the expert opinion evidence of Ross Island's expert William Weyrauch. I deny the motion.

#### A. Legal Standards for Evaluating Expert Testimony

Federal Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

    (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b)    the testimony is based on sufficient facts or data;

    (c)    the testimony is the product of reliable principles and methods; and

    (d)    the expert has reliably applied the principles and methods to the facts of the case.

Expert opinion is admissible if the expert is qualified and the expert's testimony is reliable and relevant. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). The district court acts as a "'gatekeeper,' excluding 'junk science' that does not meet the standards of reliability required under Rule 702." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). The inquiry into reliability is flexible and depends on the facts of the particular case. *See Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc).

Admissibility of expert testimony is a matter for preliminary determination by the court under Federal Rule of Evidence 104(a), and the party offering the evidence must prove admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592-93. The admissibility of expert testimony is "'a subject peculiarly within the sound discretion of the trial judge, who alone must decide the qualifications of the expert on a given subject and the extent to which his opinions may be required.'" *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir. Cal. 2000) (quoting *Fineberg v. United States*, 393 F.2d 417, 421 (9th Cir. 1968)).

The trial judge may consider a number of factors to determine the reliability of an expert's testimony, including: "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000).

## B. Weyrauch's Background and Expert Opinion

Weyrauch is a geotechnical and materials engineer who has more than 38 years of experience with concrete and other construction materials. Weyrauch has been a member, and a past president, of the American Concrete Institute since 1980. He is a member of technical committees at the Oregon Concrete and Aggregate Producers Association that oversees Oregon Department of Transportation (ODOT) certification programs for "testing fresh concrete, preparing samples and developing and adjusting concrete mix designs on ODOT projects." Pl. Opp'n 3, ECF No. 67.

Weyrauch's report concludes that the concrete failures at the Athey Creek and I-5 projects were caused by "excessively slow set times." *Id.* Weyrauch states that four factors could have

caused the slow set times: "improper concrete mix, weather conditions, admixtures, and cement." *Id.* He stated that he could eliminate concrete mix, weather, and admixtures as potential causes of the slow set times. Although Weyrauch could not test the Lehigh cement that was actually used by Ross Island at the two sites, he concluded that based on the process of elimination, Lehigh's cement caused the concrete failures.

## C. Discussion

Lehigh contends that Weyrauch's expert opinion should be excluded because he did not examine each potential cause of the concrete failures. Lehigh also argues that Weyrauch's testimony should be excluded because "he provides an insufficient explanation for why he did not bother to examine the very substance at issue in this case: data pertaining to the cement at issue." Def. Reply 4, ECF No. 80.

Ross Island contends that Weyrauch's process of elimination method is recognized as a proper basis for expert opinion. *See Clausen v. M/V New Carissa*, 339 F.3d 1049, 1061 (9th Cir. 2003). Ross Island argues that Weyrauch's extensive experience qualifies him to testify as an expert.

Lehigh's objections go to the weight, not the admissibility, of Weyrauch's expert opinions. Lehigh may, for example, cross-examine Weyrauch on his failure to test the cement at issue. I conclude that Weyrauch's expert opinion testimony as to the I-5 and Athey Creek concrete failures is admissible.

Lehigh also argues that Weyrauch's testimony as to other projects where concrete allegedly failed may should not be admitted. Weyrauch states that he did not evaluate the other alleged concrete failures in depth. I reserve ruling on this issue.

Page 19 -  OPINION AND ORDER

## IV.  Lehigh's Motion to Strike Evidence

Lehigh moves to strike portions of the testimony of Ross Island witnesses Wayne Flues,

Ken Gambill, and Morgan Johnson, although Lehigh's briefing focuses solely on the testimony

of Flues, Ross Island's quality control manager.   Lehigh contends that Flues is offering expert

testimony, violating Federal Rule of Evidence 701(c)'s prohibition against a lay witness

testifying to an opinion that is based on "scientific, technical, or other specialized knowledge

within the scope of Rule 702."  Fed. R. Evid. 701(c).  Lay witnesses' opinions must be

"'predicated upon concrete facts within their own observation and recollection—that is facts

perceived from their own senses, as distinguished from their opinions or conclusions drawn from

such facts.'"  *United States v. Durham*, 464 F.3d 976, 982 (9th Cir. 2006) (quoting *United States*

*v. Skeet*, 665 F.2d 983, 985 (9th Cir. 1982) (further citation and quotation marks omitted)).

I deny Lehigh's motion to strike.  Flues's testimony is generally based on his own

observations of the performance of Ross Island concrete at construction sites, and on his personal

knowledge of concrete.  *See, e.g. Hammann v. 800 Ideas Inc.,* No. 2:08–cv–0886–LDG–GWF,

2014 WL 1089664, at *2 (D. Nev.  Mar. 18, 2014) ("the law does not prohibit lay witnesses from

testifying based on particularized knowledge gained from their own experience").  Lehigh's

objections based on hearsay or other grounds may be addressed at trial.

## V.  Lehigh's Motion to Amend Answer

Lehigh moves to amend its answer to include an affirmative defense based on Ross

Island's apparent promise in the 2012 Price Protection Agreement to pay down $300,000 of Ross

Island's outstanding debt to Lehigh.  Ross Island apparently never fulfilled that promise.

Although Lehigh could have raised this affirmative defense sooner, the proposed

amendment should not prejudice Ross Island. I grant Lehigh's motion to amend the answer, although in light of my rulings on Ross Island's cost-to-cover claims, the amendment may be moot.

## VI. Ross Island's Motion for Partial Summary Judgment

Ross Island moves for partial summary judgment on Lehigh's affirmative defense based on the 2015 Settlement Agreement, which released all claims other than claims based on the quality of Lehigh's cement.

I deny Ross Island's motion for partial summary judgment. The affirmative defense may apply to Ross Island's claims related to the Price Protection Agreement. I also conclude that it would be premature to address entitlement to attorney's fees under the 2015 Settlement Agreement.

## CONCLUSION

Lehigh's Motion for Summary Judgment, ECF No. 46, is GRANTED as to Ross Island's Price Protection Claims, and otherwise DENIED. Lehigh's Motion for Extension of Time to Amend Pleadings, ECF No. 60, is GRANTED. Ross Island's Motion for Partial Summary Judgment, ECF No. 50, is DENIED. Lehigh's Motion to Exclude Expert Opinion Evidence from William Weyrauch, ECF No. 48, and Motion to Strike Evidence Offered by Ross Island, ECF No. 78, are DENIED.

Dated this 27th day of October, 2016.

Honorable Paul Papak
United States Magistrate Judge

Page 21 - OPINION AND ORDER